UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| BETH THOMPSON-MOONEY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 21-194-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| METROPOLITAN SECURITY | ) | **MEMORANDUM OPINION** |
| SERVICES, INC., | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Beth Thompson-Mooney was employed as a Court Security Officer ("CSO") for Defendant Metropolitan Security Services, Inc., d/b/a Walden Security ("Walden"), at the United States Bankruptcy Court for the Eastern District of Kentucky in Lexington, Kentucky ("Bankruptcy Court"). The plaintiff clashed with a fellow CSO, Yolanda "Rosie" Wells, and claimed that Wells instigated a hostile work environment based on, *inter alia*, her sexual orientation. Thompson-Mooney raised this issue with Walden, which investigated the matter and reassigned Wells. In the process, however, Walden found that Thompson-Mooney engaged in independent conduct that violated a CSO performance standard. The employer accordingly issued a written reprimand. Over the next several months, the United States Marshals Service informed Walden of three other incidents involving the plaintiff. The employer conducted thorough investigations and found that the plaintiff had indeed committed several performance standard violations. Not surprisingly, the disciplinary measures increased in severity with each violation.

- 1 -

Thompson-Mooney resigned and filed this action claiming, *inter alia*, that Walden unlawfully retaliated against her for making the hostile work environment complaint. However, as set forth in further detail below, she has not produced sufficient evidence to survive summary judgment. Walden's motion for summary judgment will be granted and this action will be dismissed.

## I. Background

### A. Walden's Contract with the Marshals Service

Walden has a contract with the Marshals Service to provide security services for judicial facilities within the United States Sixth Judicial Circuit, including the Bankruptcy Courts. [*See*, *e.g.*, Record No. 53-2, p. 10:7-20.] The defendant employs CSOs who work at these courthouses. Lead CSOs lack disciplinary authority but have scheduling responsibilities and oversee the completion of paperwork and time sheets for other CSOs. [Record No. 53-4, pp. 52:17-53:3] According to the CSO Statement of Work, and as relevant here, Lead CSOs must also specifically: (1) "[e]nsure all posts are covered as scheduled or as directed by the Government and assure that all CSOs are in proper uniform"; and (2) "[k]eep the COR [*i.e.*, Walden's Contracting Officer's Representative] informed about post coverage, potential problems, and the actions that shall be taken to correct the problem(s)." [Record No. 53-3, p. 8]

A Walden District Supervisor oversees all CSOs and Lead CSOs within a judicial district, *e.g.*, the Eastern District of Kentucky, with some disciplinary authority. [Record No. 53-6, pp. 9:15-11:3] District Supervisors are also the primary Walden contact for the Marshals Service within districts. [*See id.* at pp. 9:15-10:1.] A Walden Contract Manager oversees all CSOs, Lead CSOs, and District Supervisors within the Sixth Circuit. [Record No. 53-7, ¶ 3]

The Marshals Service also employs Judicial Security Inspectors ("JSIs") who ensure that Walden employees are complying with the terms of the security contract.  [Record No. 53-9, ⁋ 2]

The contract requires compliance with CSO performance standards contained in the statement of work, and Thompson-Mooney signed a certification acknowledging that she "underst[ood] that any violations of the performance standards could result in temporary or permanent removal from performing under any United States Marshals Service's court security contract."  [Record No. 53-11]  Both Marshals Service JSIs and Walden employees (District Supervisors and Contract Managers) may initiate an investigation of a potential performance standard violation.  [Record No. 53-7, ⁋⁋ 4-8]  Walden is responsible for conducting most of any investigation [*id.* at ⁋⁋ 4-7], and the plaintiff acknowledges that the defendant has a "contractual responsibility" to conduct investigations initiated by the Marshals Service.  [*See* Record No. 55, p. 9; *see also* Record No. 57-20, p. 47:25-48:9.]  If a violation is sustained, Walden either recommends discipline to the Marshals Service or determines the appropriate discipline itself.  [Record No. 53-7, ⁋⁋ 4-8]  Walden is also responsible for implementing all disciplinary decisions.  [*Id.* at ⁋⁋ 7-8.]

## B.  Hostility Between Thompson-Mooney and Wells

Thompson-Mooney started to work as a Bankruptcy Court CSO in 2012 and continued to serve in that capacity when Walden's security contract with the Marshals Service began in 2015.  [Record No. 53-4, p. 14:3-11]  She was later promoted to Lead CSO in August 2016.  [*Id.* at p. 51:14-15.]  Wells began to work as a Bankruptcy Court CSO in 2015.  [Record No. 53-4, p. 40:13-14]

From the outset, Thompson-Mooney and Wells did not have a cordial relationship. Thompson-Mooney alleges that Wells engaged in "constant passive/aggressive behavior" during her time in Bankruptcy Court and verbally abused her for her sexual orientation. [*See, e.g.*, Record No. 53-4, pp. 20:17-21:3, 23:18-24.] Tensions between the plaintiff and Wells increased over time, prompting an investigation by Walden. As a result of this investigation, then-Contract Manager Thomas McCombs issued Wells a letter of concern on May 1, 2018. [Record No. 53-15] McCombs found that Wells had "exhibited a contemptuous pattern that ha[d] resulted in a conflictive and disruptive environment," which violated a performance standard requiring that CSOs "[n]ot use abusive or offensive language, engage in quarrelling, intimidation by words or actions, fighting, or other disruptive activities." [*Id.*] McCombs also faulted Wells for the March 14 incident during which Wells failed to notify Thompson-Mooney of her tardiness and apparently misreported her hours on a timesheet. [*Id.*] Wells was instructed to "[d]iscontinue any and all argumentative and contemptuous behavior in the work place," and the letter was placed in her personnel file. [*Id.*]

Thompson-Mooney and Wells' relationship did not improve. Wells wrote a June 30, 2020, notarized memorandum to then-District Supervisor Ken Hall, which accused the plaintiff of various acts of misconduct over a span of several years. [Record No. 53-12] Soon thereafter, Wells volunteered to temporarily transfer to United States District Court in Frankfort, Kentucky for two to three months, which Hall approved. [Record No. 53-16, p. 4] Hall then demoted the plaintiff to CSO "because [she] couldn't get along with other CSOs and [wa]s disengaged and not personable." [*Id.*]

- 4 -

**C.  Thompson-Mooney's September 7, 2020, Letter and the Subsequent Investigation**

After learning that Wells would be returning to Bankruptcy Court in late September 2020, Thompson-Mooney tendered a letter of resignation to Hall on September 7, 2020.  [*Id.* at pp. 71:18-72:3; Record No. 53-18]  The plaintiff claimed in the letter that: (1) she had been subjected to a hostile work environment created by Wells' disagreement with her sexual orientation and religious beliefs; and (2) she would rather resign than work with Wells again.[1] [Record No. 53-18]

After submitting the letter of resignation to Hall, Thompson-Mooney showed it to Chief United States Bankruptcy Judge Gregory R. Schaaf because she "wanted him to know the truth as to why [she] was leaving." [*Id.* at p. 65:14-18.]  Chief Judge Schaaf was upset by the plaintiff's forthcoming departure and offered to call her supervisor. [Record No. 53-19]  He subsequently called Walden's new Contract Manager, Gary Boike, and advised him of his concerns. [Record No. 53-16, p. 4]

Boike then called the plaintiff on September 16, 2020, asking her to rescind her resignation, informing her that he wanted to conduct a formal investigation. [Record No. 53-4, pp. 79:13-22]  When Thompson-Mooney advised that she would not rescind her resignation unless he could guarantee that Wells would not return, he told her that Wells would not be reassigned to Bankruptcy Court. [*Id.* at pp. 79:23-80:5.]  Thompson-Mooney rescinded her resignation that same day. [*Id.* at p. 79:2-9.]

---

[1]  The plaintiff explained during her deposition that the disagreement about her religious beliefs "goes hand in hand" with the sexual orientation issue because Wells thought Thompson-Mooney's sexual orientation precluded her from being a Christian. [Record No. 53-4, pp. 70:15-71:14] She also asserted that Wells "would make . . . subtle digs when discussing the Bible in front of [her]" at work. [*Id.* at p. 70:22-71:2.]

Boike conducted the investigation, soliciting input from, *inter alia*, the plaintiff and Wells.  [Record No. 53-7, ⁋⁋ 9-16]  Following an investigatory interview with Boike, Thompson-Mooney emailed her spouse on September 23, 2020, stating: "I thought it went well.  One thing that may be an issue is the fact I showed my letter of resignation to the judge.  It was a violation of performance standards."  [Record No. 53-21]  When asked whether this statement was true during her deposition, the plaintiff responded "[t]hat's what Gary Boike told me, yes."  [Record No. 53-4, p. 82:6-12]  The plaintiff was also directly asked whether showing her letter of resignation to Chief Judge Schaaf was a violation of a performance standard, to which she replied:

> Well, in my mind, I was leaving anyway, so it didn't really matter, but I guess you could say that it [was].  It doesn't really – it says not to enter into discussion with government officials outside the chain of command unless authorized to do so in advance . . . . I don't know if showing him a letter is really a discussion of government [*sic*].  You know, I don't – I don't know.  I guess they see it that way.

[*Id.* at p. 66:9-20.]

Boike issued an October 2, 2020, report summarizing his findings that both Thompson-Mooney and Wells had "display[ed] unacceptable behavior" and that they "cannot work together."  [Record No. 53-16, p. 7]  Additionally, Boike faulted Hall for: (1) failing to notify him and Marshals Service JSI Donnie Ray of the problems between the plaintiff and Wells; and (2) demoting Thompson-Mooney without the authority to do so.  [*Id.* at p. 6.]

Following this investigation, Dick Wong, Walden Executive Vice President for Federal Business Development, advised Marshals Service contracting personnel in Alexandria, Virginia on October 26, 2022, that: (1) Thompson-Mooney had been reinstated as Bankruptcy Court Lead CSO; and (2) Wells would be transferred permanently to Frankfort.  [Record No.

53-17, p. 2]  Wong also noted that Hall had been terminated for his actions pertaining to this incident.  [*Id.*]

Additionally, Wong advised that the plaintiff would receive a letter of concern "for going outside her chain of command."  [*Id.*]  Walden had concluded that Thompson-Mooney violated a performance standard providing that CSOs may "[n]ot enter into discussions with Government officials outside the chain of command unless authorized to do so in advance by the chain of command" by notifying Chief Judge Schaaf of her intent to resign and the harassment allegations against Wells.  [Record No. 53-22]

Walden Vice President of Operations James Matthews issued a November 15, 2020, letter of concern documenting this violation which was placed in the plaintiff's personnel file. [*Id.*]  The letter also stated: "Future violations of post orders, performance standards and/or company policies may require more stringent disciplinary measures up to and including the termination of your employment."  [*Id.*]

### D.  The Second Investigation of Performance Standard Violations

While the investigation into these matters was ongoing, the plaintiff "submitted a[n October 23, 2020] work order on behalf of the USMS for a repair of an alarm system by Johnson Controls" without authorization from the Marshals Service or Walden supervisors. [Record No. 53-9, ⁋ 9] The bottom of the alarm system work order form contained a section "to be filled out by Marshal Service Personnel" who would notify Johnson Controls of the alarm problem.  [*Id.* at p. 10.]  This section was not filled out on the October 23, 2020, form because Thompson-Mooney was not a Marshals Service employee.  [*See id.*]

The plaintiff stated during her deposition that such work orders were ordinarily sent to the District Supervisor, who would send them to JSI Ray.  [Record No. 53-4, p. 87:14-17]  Ray

would then contact the appropriate company to make repairs.   [*Id.*]   However, Thompson-Mooney claimed that Ray had allowed her to submit alarm repair work orders in the past and that she had done so on "two or three occasions."  [*Id.* at pp. 87:18-88:3.]  Hall testified during his deposition that there were occasions when CSOs would submit alarm system work orders to the repair company "to cut through . . . time and red tape." [Record No. 55-3, p. 9-25]

JSI Ray asserts: (1) he never authorized the plaintiff to place work orders on behalf of the Marshals Service; and (2) such requests "were always made directly by [him]."  [Record No. 53-9, ¶ 10]  The JSI initiated an investigation regarding this incident on November 5, 2020, noting these points in a phone call with Boike.  [*Id.* at ¶ 11; Record No. 53-7, p. 45.]

Boike conducted the investigation, finding that all CSOs had received an August 24, 2020, memorandum regarding the need to direct work order requests to the District Supervisor or JSI because they cannot obligate Marshals Service funds themselves.  [*See* Record No. 53-7, pp. 42-45.]  During her investigation interview, the plaintiff affirmed that she had read this memorandum.  [*Id.* at pp. 42, 44.]  She also acknowledged that "she was aware there could be a billing to the United States Marshals Service" and that "as a contractor[,] she knew she could not spend government funds that she was not authorized to spend."  [*Id.* at p. 44.]  Consistent with her deposition testimony, Thompson-Mooney asserted that Ray had permitted her to submit such work orders in the past.  [*Id.* at pp. 43.]

Boike also interviewed Lead CSO Karen Covington of the United States District Court in Lexington, Kentucky, who affirmed that: (1) CSOs were to make alarm system work order requests to the District Supervisor and/or JSI; and (2) the JSI was ultimately responsible for placing the work order on behalf of the Marshals Service.  [*Id.* at p. 44.]  Based on these

interviews and the plain language of the work order form itself, Boike concluded that Thompson-Mooney had violated the same "chain of command" performance standard as before and another performance standard providing that CSOs shall "[n]ot violate official security procedures, instructions, post orders or regulations." [*Id.* at p. 45.]

Wong described the investigation in a November 9, 2020, letter to Marshals Service contracting personnel in Alexandria. [Record No. 53-23] Noting the forthcoming reprimand for going outside the chain of command in the resignation incident, Wong indicated that "Walden Security intends to suspend LCSO Thompson-Mooney for three (3) scheduled work days." [*Id.*] The Marshals Service acknowledged the discipline in a November 13, 2020, letter. [Record No. 53-24]

Acting District Supervisor John Broderick issued a letter on November 17, 2020, which documented the two violations and suspended the plaintiff without pay for three days. [Record No. 53-25] This letter again stated, "Further violations of your performance standards or company policies may require more stringent disciplinary measures up to and including the termination of your employment." [*Id.*]

### E.  The Third Investigation of Performance Standard Violations

On December 14, 2020, JSI Ray placed a cardboard box containing an alarm system, including an access card reader, duress button, and physical door lock, "on top of a desk in the CSO Office" in Bankruptcy Court. [Record No. 53-9, ⁋ 13] He "informed CSO Paul Adelfio that the alarm system was to be stored until it was installed[] and that the system was worth a couple thousand dollars." [*Id.*] Johnson Controls could not find the system the following day. [*Id.* at ⁋ 14.] Ray states that, when he asked the CSOs about the alarm system, "Ms. Thompson-Mooney appeared not to know where [it] was located, but . . . told [him] she would

help [him] look for [it]."  [*Id.*]  Ray found the alarm system in the garbage, and the plaintiff advised that she had thrown it away believing it to be "trash."  [*Id.*]

Thompson-Mooney acknowledged during her deposition that she understood the box to include, *inter alia*, an old duress alarm from a deceased judge's office that she "knew had not been active for years."  [Record No. 53-4, pp. 95:21-97:3]  However, she thought that it was meant to be thrown away as a part of ongoing Bankruptcy Court renovations.  [*Id.* at pp. 95:21-97:19.]  Thompson-Mooney then claimed that she would not have thrown it away "had [she] known what it was" because it is a performance standard violation to throw away government property.  [*Id.* at pp. 97:20-98:7.]  She also testified that she did not throw away other unused government property in the CSO office, particularly twenty old vests "stacked up to the ceiling," because she knew not to dispose of them.  [*Id.* at pp. 98:17-99:3.]

Thompson-Mooney justified her actions during her deposition by noting that the box was unmarked and Ray did not tell her to save it.  [*Id.* at p. 98:8-16.]  The plaintiff likewise wrote a December 18, 2020, letter to Boike stating that the box and its items were unmarked and that she "spoke up and said [she] put [the box and items] in the trash" when she heard that Ray was inquiring about them.  [Record No. 53-26, p. 4]

Ray and Boike initiated an investigation, which was primarily conducted by Walden's Southern District of Ohio District Supervisor, David Warren.  [Record No. 53-26]  Warren considered the December 18 letter to Boike and interviewed Thompson-Mooney as a part of the investigation.  [*Id.* at pp. 4-5.]  During this interview, the plaintiff admitted to Warren that she knew "the proper way to dispose of any and all government property" was to give it "to the JSI for destruction or disposal."  [*Id.* at p. 5.]  Along the same lines, she informed Warren "that she ha[d] never disposed of any government property before."  [*Id.*]  Warren also

interviewed Ray, Adelfio, and CSO Steven Florence as a part of the investigation process.  [*Id.* at pp. 5-7.]

Wong again summarized Walden's findings in a February 3, 2021, letter to Marshals Service personnel in Alexandria, observing that at least one of the items in the box "was tagged with a USMS barcode label indicating government property belonging to the USMS" and that the plaintiff was "was aware of the proper procedure for disposal of government property which was to turn the parts in to the USMS."  [Record No. 53-27, p. 2]  Wong further noted that:

> [w]hen queried by JSI Ray about the missing parts, LCSO Thompson-Mooney was less than candid and forthcoming in responding to JSI Ray by staring a little bit before answering and then responded by offering to look for the missing parts.  In fact, she knew where the parts were because she was the one who threw the box containing the parts into the trash can.

[Record No. 53-27, p. 2]  Based on this conduct, Wong advised that the plaintiff had violated performance standards stating that CSOs shall: (1) "[n]ot knowingly give false or misleading statements or conceal material facts in connection with employment, business, investigation or any other official record"; and (2) "[n]ot possess, use, lose, damage, or otherwise take Government or other private or public workplace property, including confiscated or abandoned property, without authorization from the COR."  [*Id.*]

Wong's letter indicated that Walden intended to impose a seven-day suspension based on this conduct and the two prior disciplinary incidents.  [*Id.* at p. 3.]  The Marshals Service agreed that this was the appropriate discipline.  [Record No. 53-28] Thomas Curtsinger, the new Eastern District of Kentucky District Supervisor, issued a March 18, 2021, letter documenting this decision.  [Record No. 53-30] This letter contained the familiar warning regarding the possibility of more stringent disciplinary measures for future violations.  [*Id.*]

### F.  The Fourth Investigation of Performance Standard Violations

JSI Ray observed a final performance standard violation on January 11, 2021.   The Marshals Service issues post orders that address CSO staffing assignments at various locations within the Bankruptcy Court.  [Record No. 53-4, p. 121:12-24]  One post order requires two CSOs stationed at the "entrance control point" at all times, where they "are to enforce the district's entry and identification system [and] screen all person[s] and property to ensure that no weapons, hazardous materials or other contraband enter the facility."  [Record No. 53-7, p. 64] The post order also states "[t]he LCSO is responsible for publishing a posting schedule which designates the distribution of manpower as needed to maintain a high level of security around and inside the courthouse."  [*Id.* at p. 63.]

But when Ray visited Bankruptcy Court on January 11 shortly after 8:00 a.m. for an active shooter training session,[2] he found the front door, *i.e.*, the entrance control point, unlocked and unguarded.[3]  [*Id.* at p. 58; Record No. 53-9, ⁋ 21.]  The JSI proceeded to the CSO control room where he found the plaintiff, as well as CSOs Adelfio and John Bourne socializing rather than watching the security monitors.   [Record No. 53-7, p. 57] Ray subsequently asked a different employee when the doors to the courthouse unlock and was advised that this occurs at 7:00 a.m.  [*Id.* at p. 58.]

Ray then initiated an investigation concerning the plaintiff, Adelfio, and Bourne, with Broderick soliciting input from all three CSOs.   [Record No. 53-7] Thompson-Mooney

---

[2]  Ray's office was not located at the Bankruptcy Court, and his declaration indicates that he had not previously visited that specific courthouse prior to 9:00 a.m.  [Record No. 53-9, ⁋ 20]

[3]  Ray took photographs demonstrating that the CSO post was unmanned and the front door unlocked.  [Record No. 53-9, pp. 16-17]

admitted that the building's exterior doors unlocked at 7:00 a.m., and that the entrance control point remained unguarded between 7:00 a.m. and 8:30 or 9:00 a.m., depending on the day. [*Id.* at pp. 58-61.] She attempted to justify the problem by asserting that this assignment procedure had been in effect since she started working at the Bankruptcy Court in 2012 and that "[b]y making the changes [Ray] has requested, Bankruptcy cannot operate effectively or efficiently with six (6) people [*i.e.*, CSOs]." [*Id.* at p. 61.] Thompson-Mooney also claimed during her deposition that while Ray "seldom" visited Bankruptcy Court, "he knew how we operated" and "had been there before when no one was out there [guarding the entrance control point]." [Record No. 53-4, p. 105:3-16]

Summarizing the investigation's findings, Broderick concluded in a January 20, 2021, report that the plaintiff, Adelfio, and Bourne "all failed to be sufficiently attentive to their duties and the post orders which state two CSOs shall man the Entrance Control Point while open to the public."[4] [Record No. 53-7, p. 64] He also found that, "[e]ven though this has been past practice for numerous years, LCSO Thompson-Mooney's responsibility as the Lead Court Security Officer should have been to notify the DS and[/]or the JSI of the conflict

---

[4] As it pertains to Adelfio and Bourne, this finding appears to have been premised on the points that: (1) they were socializing with Thompson-Mooney in the control room rather than watching the monitors; and (2) only one of them should have posted in the control room. [*See* Record No. 53-7, p. 64] However, it is also notable that Broderick could not determine with certainty where they were assigned on the date and time in question. This was so because: (1) the plaintiff did not keep a master schedule; and relatedly, (2) "[post] assignments [we]re written down daily on a piece of paper by LCSO Thompson-Mooney and thrown away after the day [wa]s completed." [*Id.*] Thus, Walden had no written record of January 11, 2021, assignments to reference during this investigation.

between the post orders and manning the Entrance Control Point."[5]  He recommended that Walden sustain a violation against all three CSOs for failing to adhere to the performance standard providing that they shall "[n]ot violate official security procedures, instructions, post orders or regulations."  [*Id.* at p. 64.]  The report noted the plaintiff's letter of concern, three-day suspension, and the pending violation for throwing away the duress alarm.  [*See id.* at p. 65.]  It also noted that Bourne had a pending violation for failing to adhere to two performance standards.  [*Id.*]

As was the case with the other investigations into the plaintiff's misconduct, Broderick's report was passed to Wong, who sustained the plaintiff's violation and proposed a ten-day suspension to Marshals Service personnel.[6]  [*Id.* at ¶ 28; Record No. 53-9, ¶ 24]  The Marshals Service agreed with Walden's determination on March 24, 2021.  [*See* Record No. 53-9, ¶ 25.]

### G.  Thompson-Mooney's Resignation

Thompson-Mooney tendered a letter of resignation on March 18, 2021 (effective March 26, 2021), asserting, *inter alia*, that she was subjected to retaliation following the investigation of her September 7, 2020, hostile work environment complaint, as she was "unfairly written up for nothing."  [Record No. 53-31]  Thompson-Mooney claimed during her deposition that she "saw the writing on the wall" and submitted the resignation letter when she received the

---

[5]  This finding is consistent with the lead CSO's duties as prescribed in the Statement of Work. It is ostensibly the lead CSO's responsibility to ensure that posts are assigned and covered according to the directives of the government, *i.e.*, the Marshals Service, and report post coverage (as well as potential problems regarding assignments) to Walden personnel.

[6]  It is not clear whether the violations against Bourne and Adelfio were eventually sustained by Wong or other Walden management personnel.

March 18, 2021, seven-day suspension letter.  [Record No. 53-4, p. 109:3-8]  She also believed that JSI Ray's reports of performance standard violations were a result of his desire to "get rid of [her]" following the investigation into her relationship with Wells and Hall's firing.  [*Id.* at pp. 90:7-22, 105:18-21.]  The record does not indicate that the plaintiff was advised of the ten-day suspension, and it is undisputed that she resigned before she could serve either of the final two suspensions.

## H.  Relevant Procedural Background

Thompson-Mooney filed this employment action against Walden and Ray on June 9, 2021, in Fayette Circuit Court.  [Record No. 1-1]  She initially alleged Kentucky Civil Rights Act ("KCRA") discrimination and hostile work environment claims pursuant to KRS §§ 344.040 and 344.450 against Walden, as well as a retaliation claim pursuant to KRS §§ 344.280 and 344.450 against Walden and Ray.  [*Id.*]  The defendants removed the action to this Court on July 14, 2021.  [Record No. 1]  The United States was substituted as a defendant in place of Ray, and both of these parties were dismissed by Order entered August 6, 2021.  [Record No. 19]  Walden has now filed a motion for summary judgment, seeking judgment on all remaining claims.  [Record No. 53]

## II.  Legal Standard

Summary judgment is appropriate if there is no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In other words, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party has the initial burden to show that there is no genuine issue of material fact,

but once the moving party has met its burden, the nonmoving party must demonstrate that there is sufficient evidence from which the jury could render a verdict in its favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. In reviewing a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

## III. Analysis

### A. Discrimination and Hostile Work Environment Claims

Thompson-Mooney's response to the pending motion clarifies that she is "abandoning her claim[s] of discrimination and hostile work environment" and only contests the defendant's arguments regarding her retaliation claim. [Record No. 55, p. 21] The discrimination and hostile work environment claims will be dismissed consistent with this representation. *See Guilkey v. Comm. Truck & Van Equip., Inc.*, No. 18-50-DLB-CJS, 2021 WL 1093623, at *9 (E.D. Ky. Mar. 22, 2021).

### B. Retaliation Claim

#### 1. Analytical Framework

The KCRA provides that it is an "unlawful practice" to "retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter." KRS § 344.280(1).

- 16 -

The Supreme Court of Kentucky "interpret[s] unlawful retaliation [claims] under the KCRA consistent with the interpretation of unlawful retaliation under federal law." *Brooks v. Lexington-Fayette Urban Hous. Auth.*, 132 S.W.3d 790, 802 (Ky. 2004). Thus, the standards for evaluating federal Title VII retaliation claims also generally apply to Thompson-Mooney's KCRA retaliation claim. *See Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009).

And both parties acknowledge that the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to the retaliation claim. [*See* Record No. 53-1, p. 21; Record No. 55, p. 15.] Under this framework, a plaintiff employee bears the initial burden of establishing a prima facie case by offering evidence that: (1) she "engaged in protected activity"; (2) "the employer knew of the exercise of the protected right"; (3) "an adverse employment action was subsequently taken against the employee"; and (4) "there was a causal connection between the protected activity and the adverse employment action." *Hamilton*, 556 F.3d at 435 (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)). This initial burden is "not onerous." *Nguyen v. Cty. of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)).

If the employee "makes out a prima facie case of retaliation, the burden shifts to the employer to produce evidence of a legitimate, nonretaliatory reason for its actions." *Dulaney v. Flex Films (USA), Inc.*, No. 20-6098, 2021 WL 3719358, at *6 (6th Cir. Aug. 23, 2021) (citing *Niswander*, 529 F.3d at 720). This is also not an onerous burden, but the employer "must offer at least some evidence of its rationale." *Ford v. Securitas Sec. Servs. USA, Inc.*, 338 F. App'x 483, 489 (6th Cir. 2009).

Assuming the employer offers such evidence, the burden shifts back to the employee to "demonstrate that the employer's proffered nonretaliatory reason for its actions was in fact only pretext for retaliatory conduct." *Dulaney*, 2021 WL 3719358, at *6 (citing *Niswander*, 529 F.3d at 720).  The employee may establish pretext by showing: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012)).  These categories "marshal[] evidence and focus[] it on the ultimate inquiry," which is "whether the employer made up its stated reason to conceal intentional [retaliation]." *Id.* (third alteration in original) (citing *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009)).  In other words, "summary judgment is proper" on pretext grounds "if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation." *Chen*, 580 F.3d at 400 n. 4 (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000)).

"Courts should not allow this burden-shifting analysis to obfuscate the appropriate question—whether there exists a genuine issue of material fact." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016) (cleaned up) (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011)).  Thus, the Court's analysis assesses "whether there is sufficient evidence to create a genuine dispute at each stage of the McDonnell Douglas inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).

### 2.  Prima Facie Case

#### a.  Protected Activity and Walden's Knowledge of the Protected Activity

Walden concedes that the plaintiff "engaged in protected activity when she submitted her first letter of resignation [alleging a hostile work environment] on September 7, 2020, and that [it] knew of the activity."  [Record No. 53-1, p. 21] Accordingly, the Court will proceed with the understanding that the September 7, 2020, letter of resignation serves as a valid basis for the retaliation claim.

#### b.  Adverse Employment Action

The plaintiff essentially argues that every negative interaction with Walden following the September 7, 2020, letter counts as an "adverse employment action," including: (1) the November 15, 2020 letter of concern placed in her personnel file; (2) the November 17, 2020 three-day suspension; (3) the March 18, 2021 seven-day suspension; (4) the "charge" and investigation of the unguarded entrance control point incident; and (5) her resignation, which she claims was a constructive discharge.  [*Id.* at pp. 16-20.]  But Walden contends that no constructive discharge occurred and that most of the other events do not constitute adverse employment actions.  [Record No. 53-1, pp. 21-22; Record No. 57, pp. 4-11]

An "adverse employment action" must be "materially adverse," meaning that it must be "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a complaint [of discrimination]."  *White v. Coventry Health and Life Ins. Co.*, 680 F. App'x 410, 414 (6th Cir. 2017) (internal quotation marks omitted) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).  "Context matters," but this is an objective standard.  *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68-69.  And generally, an adverse employment action "must be more disruptive than a mere inconvenience or an

alteration of job responsibilities." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996) (quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).

Turning to the November 15, 2020, letter of concern, written reprimands are typically not materially adverse unless they lead to further consequences, "such as lowered pay, demotion, suspension, or the like," or are "related to a larger pattern of intimidation." *Taylor v. Geithner*, 703 F.3d 328, 338 (6th Cir. 2013) (quoting *Creggett v. Jefferson Cnty. Bd. of Educ.*, 491 F. App'x 561, 566 (6th Cir. 2012)). Here, the letter of concern was essentially a written reprimand, as it was placed in the plaintiff's personnel file and did not immediately produce materially adverse consequences. It was also the result of an investigation during which Walden asked Thompson-Mooney to rescind her resignation, reinstated her as Lead CSO, and transferred Wells – all objectively good results for the plaintiff.

On the other hand, the letter of concern and the performance standard violation underlying it ostensibly formed part of the basis for the November 17, 2020, suspension without pay. That suspension was issued just two days later. Thus, the question of whether the letter of concern constitutes a materially adverse employment action is close, and the Court concludes that there is a genuine dispute of material fact on this issue.

Next, suspensions without pay are generally considered adverse employment actions. *See*, *e.g.*, *Weaver v. Cty. of Twinsburg*, 580 F. App'x 386, 391 (6th Cir. 2014). The record presents no reason to reach a contrary conclusion for the November 17, 2020, three-day suspension, which the plaintiff actually served.

Turning to the seven-day suspension, the Sixth Circuit has found that when an employee resigns before serving a suspension without pay, there is no materially adverse employment action for the purposes of a Title VII employment *discrimination* claim because

- 20 -

the resignation prevents the "tangible" harms that are usually associated with such actions. *See Lee v. Cleveland Clinic Found.*, 676 F. App'x 488, 497 (6th Cir. 2017). Still, the *Lee* court found that the suspension at issue was an adverse employment action for the purpose of a Title VII *retaliation* claim when considered in conjunction with prior increased surveillance of the plaintiff employee. *Id.* at 499. The court concluded that "[a] reasonable jury could find that these actions would have dissuaded a reasonable worker from making or supporting a charge of discrimination" and noted that "burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context." *Id.* (internal quotation marks omitted) (quoting *Laster v. Cty. of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014)).

The seven-day suspension was announced on March 18, 2021, and its severity was premised, in part, on the two prior disciplinary incidents. Given the retaliation claim analysis in *Lee*, there appears to be a dispute of material fact regarding whether the issuance of the seven-day suspension constitutes an adverse employment action.

The ten-day suspension is another matter, however. It is undisputed that Thompson-Mooney did not serve this suspension, and the record also does not indicate that she was advised of Walden's decision (which the Marshals Service acknowledged on March 24, 2021) prior to her resignation on March 26, 2021. At any rate, the plaintiff contends only that the "charge" of misconduct and investigation into the unmanned entrance control point constitutes an adverse employment action. Assuming Thompson-Mooney uses the term "charge" to refer to Ray's complaint initiating the investigation, it cannot be an adverse employment action because Ray is a Marshals Service employee, not a Walden employee. *See*, *e.g.*, *Stone v. Bd. of Directors of TVA*, 35 F. App'x 193, 199 (6th Cir. 2002) ("An adverse

- 21 -

employment action is a materially adverse change in the terms or conditions of the plaintiff's employment *caused by the employer's actions*.") (emphasis added) (citation omitted).

Further, misconduct investigations themselves generally do not rise to the level of adverse employment actions. *See*, *e.g.*, *Ellis v. Shelby Cnty. Land Bank Dept.*, 548 F. App'x 320, 322 (6th Cir. 2013); *Bivins v. U.S. Pipe & Foundry Co.*, 48 F. App'x 570, 572 (6th Cir. 2002) (per curiam). And Thompson-Mooney continued working while most of this investigation was conducted prior to her resignation in late March 2021. It was, at most, an inconvenience that could not objectively dissuade her from engaging in further protected activities.

That leaves the constructive discharge argument. A plaintiff may offer evidence of constructive discharge as a means of establishing an adverse employment action. *See*, *e.g.*, *Wade v. Automation Personnel Servs., Inc.*, 612 F. App'x 291, 300 (6th Cir. 2015). There are two types of constructive discharge, only one of which is relevant here, *i.e.*, "[w]hen [the] employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns." *Laster*, 746 F.3d at 728 (emphasis omitted) (quoting *EEOC v. Univ. of Chicago Hosp.*, 276 F.3d 326, 331-32 (7th Cir. 2002)). As the parties acknowledge [Record No. 53-1, pp. 13, 22; Record No. 55, p. 18], Thompson-Mooney must show that: "(1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and (2) the employer did so with the intention of forcing the employee to quit." *Funk v. Cty. of Lansing*, 821 F. App'x 574, 580 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Laster*, 746 F.3d at 727-28).

"An employee who quits a job in apprehension that conditions may deteriorate later is not constructively discharged." *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002). In

other words, "the employee is obliged not to assume the worst, and not to jump to conclusions too fast." *Id.* (internal quotation marks omitted) (quoting *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987)).

When one considers the course of events after the September 7, 2020, letter, Thompson-Mooney cannot establish either prong of the constructive discharge inquiry. She received a letter of concern as a result of the subsequent investigation, but as the defendant notes [Record No. 53-1, p. 22], Boike also asked her to rescind her resignation. Additionally, Walden management personnel permanently transferred Wells and reinstated the plaintiff as Lead CSO.

Moreover, Walden's later conduct concerning the other three incidents does not arise to a constructive discharge. Ray, who is not a Walden employee, took part in initiating all three investigations. Different Walden employees (Boike, Warren, and Broderick) assumed primary responsibility for conducting the initial stage of these three investigations. They all considered the plaintiff's version of events and solicited input from various other sources. Walden's management (particularly Wong) found Thompson-Mooney to be in violation of performance standards on each occasion, meriting increasingly strict suspensions. But the evidence demonstrates that the employer conducted thorough investigations each time. And as set forth in further detail below, Walden's conclusions were not unreasonable. *See Kinamore v. EPB Elec. Util.*, 92 F. App'x 197, 205 (6th Cir. 2004) (finding no intent to compel a resignation where, *inter alia*, the employer imposed a suspension that was "well within the range of reasonable responses to the incident" underlying the discipline). Thus, the Court cannot conclude that the "the employer deliberately created intolerable working conditions, as

perceived by a reasonable person" or that Walden created such conditions with the intention that Thompson-Mooney resign.

In summary, the plaintiff has offered evidence to establish, at least, a dispute of material fact regarding whether the November 15, 2020, letter of concern, November 17, 2020, three-day suspension, and the March 18, 2021, announcement of the seven-day suspension constituted adverse employment actions. Thus, the KCRA retaliation claim will not be dismissed for lack of an adverse employment action. However, the Court does not find that the plaintiff has offered evidence sufficient to proceed with a retaliation claim based on an adverse employment action for: (1) the "charge" and investigation of the unmanned entrance control point; or (2) constructive discharge.

### c. Causal Connection

The final element of a prima facie case is the causal connection between a protected activity and an adverse employment action. Walden argues that: (1) temporal proximity alone is generally insufficient to establish a causal connection; (2) intervening acts negate any inference of a causal connection between her September 7, 2020, hostile work environment complaint and the alleged adverse employment actions; and (3) there is compelling evidence that Walden's conduct was not retaliatory. [Record No. 53-1, pp. 23-24; Record No. 57, pp. 11-12] Thompson-Mooney does not substantively address the defendants' arguments and only asserts that she can establish a causal connection based on the temporal proximity between the September 7, 2020, resignation letter and all of her alleged adverse employment actions. [Record No. 55, p. 20]

"[T]emporal proximity alone will [generally] not support an inference of retaliatory discrimination when there is no other compelling evidence." *Arendale v. Cty. of Memphis*,

- 24 -

519 F.3d 587, 606 (6th Cir. 2008) (quoting *Nguyen v. Cty. of Cleveland*, 229 F.3d at 563). This is particularly true where an alleged adverse employment action does not occur "very close in time" to the moment an employer learns of the relevant protected activity. *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). And when a plaintiff employee relies on temporal proximity, an "intervening legitimate reason to discipline" her "extinguishes any inference" of a causal connection. *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012); *accord, e.g.*, *Wingo v. Michigan Bell Tel. Co.*, 815 F. App'x 43, 47 (6th Cir. 2020); *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 628 (6th Cir. 2013).

Here, the plaintiff engaged in the protected activity on September 7, 2020, when she submitted the letter of resignation complaining of a hostile work environment to Hall. She then showed the letter to Chief Judge Schaaf, which eventually resulted in an investigation by Walden. During that investigation, Walden determined that showing the letter to Chief Judge Schaaf was a violation of the performance standard that CSOs may "[n]ot enter into discussions with Government officials outside the chain of command unless authorized to do so in advance by the chain of command." The plaintiff essentially admitted this to be true during her deposition, and her September 23, 2020, email regarding the interview with Boike acknowledged, without any qualification, that she had indeed committed a performance standard violation. Moreover, the text of the standard plainly indicates that her conduct did, in fact, violate the relevant performance standard, and Thompson-Mooney offers no explanation why this conduct did not constitute such a violation.

Thus, there was unquestionably an intervening legitimate reason to issue the November 15, 2020, letter of concern. The intervening reason to discipline Thompson-Mooney breaks

the causal chain between the protected activity and the alleged adverse employment action, negating any inference of a causal connection premised on temporal proximity.

This may be sufficient to break the causal chain for the remaining alleged adverse employment actions, but there were other intervening reasons justifying Walden's later conduct. Further, the plaintiff lacks compelling evidence that her September 7, 2020, complaint of a hostile work environment caused Walden to take these alleged adverse actions.

First, placing the Johnson Controls work order on October 23, 2020, was a violation of, at least, the performance standard providing that CSOs shall "[n]ot violate official security procedures, instructions, post orders or regulations." JSI Ray issued the memorandum regarding the proper procedure for submitting work orders on August 24, 2020. The plaintiff admitted to reading this memorandum during her investigation interview with Boike and further acknowledged that she could not obligate Marshals Service funds herself without authorization. Additionally, the work order form she submitted on October 23, 2020, had a section dedicated to Marshals Service authorization, which was not completed because she did not seek such authorization.

Thompson-Mooney and Hall have asserted that CSOs were permitted to place work orders in the past, but there is no evidence that: (1) Thompson-Mooney or any other CSO independently placed a work order following Ray's issuance of the August 24, 2020, memorandum forbidding this practice; or (2) Ray or any other Marshals Service employee indicated that CSOs were permitted to do so following the issuance of the memorandum. Thus, there is no dispute of material fact regarding whether she "violate[d] official security procedures, instructions, post orders or regulations," *i.e.*, the Marshals Service's instructions set forth in Ray's memorandum. This violation served as a legitimate reason to issue the

- 26 -

November 17, 2020, three-day suspension, and there is no compelling evidence that this measure was retaliatory.

Next, the March 18, 2021, seven-day suspension was also the result of, at least, one performance standard violation.  There may be a dispute regarding whether the items in the box at issue were labeled, but Thompson-Mooney admitted during her deposition that she knew the box contained an old duress alarm that was previously used in a Bankruptcy Court office.  The plaintiff may have believed it to be "trash," but she also indisputably knew she was not permitted to dispose of unused government property, *e.g.*, the old vests in the CSO office.

Setting aside the fact that it is difficult to believe that *any* CSO would fail to recognize that a duress alarm is government property, the plaintiff's deposition testimony (as well as her interview statements to Warren) establish that she knew she disposed of government property without authorization to do so.  Her conduct surrounding this incident was, at least, a violation of the performance standard providing that CSOs may "[n]ot possess, use, lose, damage, or otherwise take Government or other private or public workplace property, including confiscated or abandoned property, without authorization from the COR."  There is no compelling evidence that Walden's disciplinary decision was retaliatory, and the performance standard violation serves as an intervening legitimate reason to issue the seven-day suspension.

And although they do not constitute adverse employment actions, there is no causal connection between the September 7, 2020, complaint of a hostile work environment and the "charge" and investigation of the unguarded entrance control point incident. Thompson-Mooney concedes that Walden is contractually obligated to conduct an

- 27 -

investigation initiated by the Marshals Service. Thus, Ray's complaint initiating the investigation is an intervening legitimate reason for Walden's investigatory conduct.

Further, the plaintiff ostensibly committed a violation of the performance standard providing that CSOs should "[n]ot violate official security procedures, instructions, post orders or regulations." The relevant post order required that two CSOs be assigned to the entrance control point and directed the Lead CSO to ensure that posts were staffed appropriately. And significantly, Broderick found that the Bankruptcy Court's past posting practices did not justify the plaintiff's inaction because it was her duty to report staffing issues. This conclusion was consistent with the statement of work, which would ostensibly constitute another official security procedure, instruction, or regulation. Thus, the plaintiff's conduct provides an independent intervening reason to justify Walden's investigation. And again, there is no evidence of retaliation, compelling or otherwise.

In short, the record indicates that the plaintiff violated at least one performance standard for every disputed action that Walden took. These performance standard violations serve as intervening legitimate reasons for the defendant's actions. Ray's initiation of the entrance control point investigation was also an intervening reason justifying Walden's conduct relating to that infraction. Inasmuch as Thompson-Mooney solely relies on temporal proximity to complete her prima facie case, the intervening legitimate reasons for Walden's conduct negate any inference of a causal connection.

Further, there is no compelling evidence of retaliation to support a causal connection between the protected activity and any alleged adverse employment action. In fact, the evidence overwhelmingly supports the opposite conclusion. Because the plaintiff cannot establish this element of her prima facie case, summary judgment is appropriate.

### 3.  Legitimate Nonretaliatory Reasons and Pretext

Although summary judgment is warranted based on the plaintiff's failure to establish a prima facie KCRA retaliation claim, the Court will briefly address the remaining *McDonnell Douglas* steps.  Walden's evidence easily satisfies its burden at the second stage of the inquiry because it demonstrates that: (1) the defendant conducted thorough investigations of every alleged performance standard violation; (2) reasonably determined that violations occurred; (3) and imposed appropriate discipline.

Thus, the burden shifts back to the plaintiff to establish pretext.  Apart from unsubstantiated "papering the file" assertions, the plaintiff only offers one specific pretext argument: the performance standard violations were too innocuous to merit "the draconian punishments that resulted."  [Record No. 55, p. 21]  But the disciplinary decisions cannot be considered in a vacuum, and the record demonstrates that Walden considered past violations every time it weighed the appropriate disciplinary measure for a new violation.  Unsurprisingly, the discipline became more serious with each infraction, starting with a letter of concern and ending with an unserved seven-day suspension and (likely) unannounced ten-day suspension.

This was consistent with the warning contained in every disciplinary letter the plaintiff received, which stated that future transgressions may result in "more stringent disciplinary measures."  Moreover, it is notable that Broderick's January 20, 2021, investigation report did document Bourne's disciplinary record.  Thus, it appears that Walden generally accounted for employees' disciplinary records when it considered disciplining CSOs for performance standard violations.

- 29 -

Additionally, Walden relies on the "honest belief rule" [Record No. 53-1, pp. 24-25], which holds that "so long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). For the rule to apply, the employer's disciplinary decision must be "based on particularized facts rather than on ignorance and mythology." *Id.* This does not require that "the decisional process used by the employer be optimal or that it left no stone unturned." *Id.* at 807. Instead, "the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* at 807. "This rule allows a defendant to show that while its action was mistaken, it was not taken with [retaliatory] intent." *Banks v. Bosch Rexroth Corp.*, 15 F. Supp. 3d 681, 696 (E.D. Ky. 2014) (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 714 (6th Cir. 2007)).

As the defendant argues, all of the "suspensions were issued after a documented process in which Walden Security and the USMS reviewed the Performance Standards violations and collaborated on the appropriate discipline." [Record No. 53-1, p. 25] The same is true of the letter of concern. Walden considered information from various sources as a part of each investigation, and significantly, the defendant always consulted the plaintiff for her perspective on the conduct at issue. *See Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 286 (6th Cir. 2012) (observing that "interviewing the employee and some or all of his witnesses" is an "'optimal' investigation"). And as noted in the previous section, the investigations revealed evidence indicating that she did, in fact, commit at least one performance standard violation during each incident at issue.

At various points, Thompson-Mooney's response to the motion for summary judgment emphasizes that she worked for years as a Bankruptcy Court CSO without any disciplinary incidents. [Record No. 55, pp. 1, 3, 19] But the fact that she "was a reliable employee with a good employment record is not relevant" to the honest belief rule analysis because "it proves no more than that absent any misconduct on [her] part, [the employer] was unlikely" to discipline her. *Seeger*, 681 F.3d at 286.

There is no doubt that the plaintiff disagrees with some of the sources Walden relied upon in making its decisions, particularly JSI Ray. For example, she disagrees with Ray regarding whether he: (1) allowed her (or other CSOs) to place work orders in the past without prior authorization; and (2) had visited Bankruptcy Court prior to 9:00 a.m. such that he would have known the entrance control point was unguarded for approximately two hours at the beginning of each workday. She also claims to have been more forthcoming regarding the duress alarm incident than Ray asserted.

But Walden conducted extensive investigations in the process of reaching its disciplinary decisions, and it tended to agree with Ray. The record does not suggest that this was an error in judgment, but even if it was, the employer would be entitled to summary judgment under the honest belief rule because it made reasonably informed and considered decisions before taking the alleged adverse employment actions.

At base, the plaintiff has not met her burden of producing sufficient evidence of pretext to survive summary judgment. Notwithstanding this point, the defendant has produced ample evidence concerning the thoroughness of its investigations and disciplinary decision-making. While Walden need not have conducted "optimal" investigations to succeed at summary judgment under the honest belief rule, it appears to have come close to doing so in this case.

- 31 -

Thus, even if the plaintiff could establish a causal connection for the purposes of her prima facie case, summary judgment would be appropriate.

### IV.  Conclusion

The plaintiff has abandoned her discrimination and hostile work environment claims. And while there is a dispute of material fact regarding whether Thompson-Mooney can establish that certain actions were materially adverse, her temporal proximity arguments are inadequate to establish a causal connection between her protected activity and any of her employer's alleged adverse employment actions.   Regardless, she has failed to establish pretext, and the employer has offered evidence to support its reliance on the honest belief rule. Because the plaintiff's retaliation claim fails at both the first and third steps of the *McDonnell Douglas* inquiry, summary judgment will be entered in the defendant's favor.

Accordingly, it is hereby

**ORDERED** as follows:

1. Defendant Metropolitan Security Services, Inc., d/b/a Walden Security's motion for summary judgment [Record No. 53] is **GRANTED**.

2. All remaining claims asserted by Plaintiff Beth Thompson-Mooney in this action are **DISMISSED** with prejudice.

Dated: August 9, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky

- 32 -